UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE INSTITUTE OF MULTIDIMENSIONAL MEDICINE,<br><br>    Plaintiff,<br><br>          v.<br><br>METAGENICS, INC.,<br><br>    Defendant. | Civil Action No. 22-1308 (JEB) |

## MEMORANDUM OPINION

Amid the upheaval of the COVID-19 pandemic, businesses made changes to adapt to new circumstances. In this suit, Plaintiff The Institute of Multidimensional Medicine (TIMM), an integrative-healthcare practitioner's office, contends that certain such changes implemented by Defendant Metagenics, Inc., a supplier of healthcare products, breached their contract. TIMM's Complaint enumerated seven causes of action, which Metagenics now moves to dismiss. Agreeing that each count is deficient, the Court will grant the Motion.

**I.      Background**

At this stage, the Court must accept the facts as alleged in the Complaint as true, although fortunately the parties here are in general agreement on the genesis of their partnership and the causes of their disquietude. In 2011, Plaintiff, a two-person practitioner's office, teamed up with Defendant to sell the latter's products — nutritional supplements and medical foods. See ECF No. 16 (First Am. Compl.), ¶¶ 1, 26. At the time the agreement was struck, Defendant's products exhibited labels stating that they were "practitioner exclusive." Id., ¶ 2. Plaintiff took this to mean that "the product will only be distributed from a practitioner's office." Id. TIMM claims that Metagenics's policies and processes support this understanding. It alleges that

1

Defendant required TIMM "to provide medical license information" to purchase Metagenics products, id., ¶ 8, and that individual customers were matched by Metagenics "to a local provider for a medical recommendation." Id., ¶ 9.

For about nine years, all was hunky-dory. Enter COVID-19. During the pandemic, many people rarely visited offices, including their doctors' offices, in person. Apparently in response to these changed circumstances, Defendant began to sell its products directly on Amazon. Id., ¶¶ 11–12. It "did not notify practitioners" of this change in its practice, and it "continued to advertise [its] products as practitioner exclusive." Id., ¶ 12. Noting this change in business practice, Plaintiff met with a Metagenics local representative on January 12, 2022, to discuss the possibility of TIMM's selling Metagenics products directly on Amazon as well. Id., ¶ 13. At that January 12 meeting, Plaintiff was informed that if it were to sell Metagenics products on Amazon, this would "not be an issue." Id., ¶ 14. But on or around February 9, Defendant canceled its contract with Plaintiff on the ground that TIMM's distribution of Metagenics products on Amazon violated Defendant's policies and their contract. Id., ¶¶ 15, 17; see also ECF No. 17 (Motion to Dismiss) at 3.

In the Facts section of its Complaint, TIMM alleges that Metagenics's unilateral cancellation was a "violation of [its] contract with TIMM" and that this "hurt [Plaintiff's] reputation, and it jeopardized the continuity of care for [its] patients." Id., ¶ 15. TIMM initially filed in the Superior Court for the District of Columbia on April 8, 2022, but Metagenics promptly removed the case here on the basis of diversity jurisdiction on May 12. See ECF No. 1 (Notice of Removal), ¶¶ 1, 5.

Plaintiff's First Amended Complaint, filed July 14, consists of seven causes of action that are worthy of a first-year contracts syllabus. Count I alleges that Metagenics fraudulently

2

misrepresented that its products were "practitioner exclusive." First Am. Compl., ¶ 26. In Count II, Plaintiff alleges that Metagenics breached their contract. Id., ¶ 35. Count III alleges negligent misrepresentation. Id., ¶ 49. Count IV alleges that Metagenics breached its duty of good faith and fair dealing, id., ¶¶ 54–55, and Count V alleges unjust enrichment. Id., ¶¶ 60–61. Count VI claims a breach of express and implied warranties of merchantability. Id., ¶¶ 65–73. Finally, Count VII alleges that Metagenics breached its fiduciary duty to TIMM. Id., ¶¶ 88–90. Defendant now moves to dismiss the Complaint in its entirety.

**II.     Legal Standard**

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a claim for relief when the complaint "fail[s] to state a claim upon which relief can be granted." In evaluating a motion to dismiss, the court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks and citation omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (internal quotation marks omitted). A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the facts alleged in the complaint "must be enough to raise a right

to relief above the speculative level." Twombly, 550 U.S. at 555–56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

A motion to dismiss under Rule 12(b)(6) must rely solely on matters within the pleadings, see Fed. R. Civ. P. 12(d), which includes statements adopted by reference as well as copies of written instruments joined as exhibits. See Fed. R. Civ. P. 10(c). Documents that a defendant attaches to a motion to dismiss are "part of the pleadings" under Rule 10(c) if they are integral to its claim, they are referred to in the complaint, and their authenticity is undisputed. See Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004); Hinton v. Corrs. Corp. of Am., 624 F. Supp. 2d 45, 46–47 (D.D.C. 2009). The court may thus consider those materials on a motion to dismiss without treating the motion "as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); Marshall v. Honeywell Tech. Solutions, Inc., 536 F. Supp. 2d 59, 65 (D.D.C. 2008).

### III. Analysis

Metagenics has moved to dismiss all seven counts. For ease of analysis, the Court will address some of the causes of action separately and some together.

#### A. Counts I and III: Fraudulent and Negligent Misrepresentation

Count I alleges that Defendant made fraudulent misrepresentations regarding its products being "practitioner exclusive" because it now sells its products directly to consumers on Amazon as well. See First Am. Compl., ¶¶ 26, 27. Count III alleges, in the alternative, that Defendant was negligent in making such misrepresentations. Id., ¶¶ 48–49.

The elements of the torts of fraudulent and negligent misrepresentation are similar. To state a claim for the former under D.C. law, a plaintiff must allege: "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to

4

deceive, and (5) an action that is taken in reliance upon the representation." Hercules & Co., Ltd. v. Shama Restaurant Corp., 613 A.2d 916, 923 (D.C. 1992). For commercial entities dealing with each other at arm's length, any such reliance must also be (6) "objectively reasonable." Id. at 933. Finally, a plaintiff must also (7) "have suffered some injury as a consequence of [its] reliance on the misrepresentation." Chedick v. Nash, 151 F.3d 1077, 1081 (D.C. Cir. 1998) (citing Dresser v. Sunderland Apartments Tenants Ass'n, Inc., 465 A.2d 835, 839 (D.C. 1983)).

To state a claim for negligent misrepresentation, conversely, a plaintiff is obliged to allege the same elements, "except that they do not include the *scienter* requirements of a fraud claim." Parr v. Ebrahimian, 774 F. Supp. 2d 234, 240 (D.D.C. 2011). The plaintiff must instead plead "that the defendant 'made a false statement or omitted a fact that he had a duty to disclose,' that the false statement or omission 'involved a material issue,' and that the plaintiff 'reasonably relied upon the false statement or omission to [his] detriment.'" Id. (quoting Redmond v. State Farms Ins. Co., 728 A.2d 1202, 1207 (D.C. 1999)).

A plaintiff, however, may not bring a claim for either fraudulent or negligent misrepresentation when the basis for that claim is a breach of contract. Such a claim "must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship." Choharis v. State Farm Fire & Cas. Co., 961 A.2d 1080, 1089 (D.C. 2008). In other words, "if one promises to pay another a given sum of money by a named day, the contract creates a duty to pay; but a breach of that duty is not a tort.'" Tate v. Aetna Cas. & Sur. Co., 253 S.E.2d 775, 777 (Ga. Ct. App. 1979).

The Court finds that Counts I and III must be dismissed because the causes of action, as alleged, cannot be separated from Plaintiff's breach-of-contract claim in Count II. TIMM alleges

that it entered into a contractual agreement with Metagenics in 2011, at which time the products were labeled as "practitioner exclusive," and that it relied on Metagenics's statements to that effect. See First Am. Compl., ¶¶ 26, 29. Plaintiff also alleges that this label "tells" customers that "the product will only be distributed from a practitioner's office." Id., ¶ 2. Plaintiff alleges that this was a misrepresentation. Id., ¶ 27. These allegations make clear that the focus of both Counts I and III is Metagenics's alleged breach of the parties' contract through the sale of its own products on Amazon during the pandemic. But, as just explained, a plaintiff may not bring a claim for misrepresentation when the basis is a breach of contract.

      Notwithstanding the above, a plaintiff may state a tort claim for fraud in the inducement — that is, that she was tricked into _entering_ an agreement on the basis of fraudulent representations. Defendant acknowledges this: "'[M]isrepresentations that _precede_ the formation of [a] contract and are alleged to have induced plaintiffs' to enter into a contract are not duplicative of a breach-of-contract claim." MTD at 6. Here, however, all TIMM offers is the strained suggestion that, at the time of the contract formation, it is somehow "plausible that Metagenics knew that it was going to sell its products on Amazon" nine years later during a global pandemic. See First Am. Compl., ¶ 31; see also ECF No. 20 (Pl. Opp.) at 5. As this dubious assertion stands on its own with no supporting allegations, it does not clear the plausibility bar. Nor can TIMM save its bacon by contending that "[d]iscovery will help decipher Defendant's intent when making the misrepresentations" in 2011. See First Am. Compl., ¶ 31. One cannot plead a factually unsupported cause of action in the hopes of uncovering helpful information in discovery. See Iqbal, 556 U.S. at 678 (complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face") (internal quotation marks and citation omitted). Finally, to the extent that Plaintiff

6

believes that Metagenics made actionable representations at the January 12, 2022 meeting, it does not plead such representations as a basis for these counts.

### B. Counts II and IV: Breaches of Contract and Covenant

Plaintiff's second and fourth counts allege breach of contract and breach of the covenant of good faith and fair dealing, respectively. See First Am. Compl., ¶¶ 35–39, 54–56. There are four elements to a breach-of-contract claim in the District of Columbia: "[A] party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." Brown v. Sessoms, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (quoting Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009)).

Every contract, furthermore, is held to contain "an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Abdelrhman v. Ackerman, 76 A.3d 883, 891 (D.C. 2013) (quoting Hais v. Smith, 547 A.2d 986, 987 (D.C. 1988)). While the "meaning of 'good faith' varies with context," good-faith performance "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Wright v. Howard Univ., 60 A.3d 749, 755 (D.C. 2013). This "prevents a party from evading the spirit of the contract, willfully rendering imperfect performance or interfering with the other party's performance." Hais, 547 A.2d at 987–88 (D.C. 1988). Acting in such a manner may subject a party to independent liability. See, e.g., Paul v. Howard Univ., 754 A.2d 297, 310 (D.C. 2000).

Metagenics raises a number of challenges to these counts, but as regards Count II, the Court focuses on one in particular — namely, that Plaintiff's Complaint fails to identify a provision of the contract that Defendant violated. More specifically, all TIMM alleges is a general "fail[ure] to adhere to the direct terms of [Metagenics's] agreement" with TIMM "as

7

outlined" in Defendant's promotional materials and new account form. See First Am. Compl., ¶ 35. The latter includes an "Internet Policy" that addresses sales of Metagenics products on third-party sites. Id., ¶ 16; ECF 14-2, Exh. B (Internet Policy) at 4. Yet, TIMM never says how these materials are part of its contract with Defendant. Even assuming, moreover, that the contract somehow incorporates the Internet Policy, such policy would still be of no help to Plaintiff. The policy explains that it is customers, not Defendant, who are prohibited from selling Metagenics products on third-party platforms. See Internet Policy at 4.

Perhaps seeing the handwriting on the wall, TIMM argues in its Opposition that the breach-of-contract claim also includes an allegation that Metagenics breached a separate portion of its Internet Policy, which requires 10 days' notice before cancellation of an account. See Opp. at 8; see also First Am. Compl., ¶¶ 16–17. But this allegation is included only in the general Facts section of the Complaint and is not actually alleged in Count II. The Court will thus dismiss this count without prejudice.

The same problem of factual deficiency plagues Plaintiff's claim for breach of the implied covenant of good faith and fair dealing in Count IV. Just as TIMM has not alleged facts to show that Metagenics made actionable misrepresentations or breached its contract, it has similarly not sufficiently pled that Defendant has "evad[ed] the spirit of the contract, willfully render[ed] imperfect performance or interfer[ed] with the other party's performance." Hais, 547 A.2d at 987–88. This count meets the same fate.

    C.  Count V: Unjust Enrichment

Next up is unjust enrichment. This count goes nowhere because, as a general rule, allegations of an express contract warrant "dismissal of an unjust enrichment claim at the motion-to-dismiss stage." United States ex rel. Purcell v. MWI Corp., 254 F. Supp. 2d 69, 79

(D.D.C. 2003); see also Intelect Corp. v. Cellco Partnership GP, 160 F. Supp. 3d 157, 190 (D.D.C. 2016) (explaining that "in order to claim a remedy for unjust enrichment, there must be no contract — either express or implied"). Plaintiff argues in its Opposition that unjust enrichment can be pled in the alternative. See Opp. at 10. But this is only possible when such an allegation is "supported by, at the very least, an allegation that there is no valid contract." United States ex rel Morsell v. Symantec Corp., 130 F. Supp. 3d 106, 129 (D.D.C. 2015). Because no such allegation is made here, the Court will dismiss this count.

### D.  Count VI: Breach of Warranties

Count VI alleges a breach of both an express warranty and the implied warranty of merchantability on the ground that Metagenics's products were sold on Amazon, in alleged contradiction of the product labels advertising that they were "practitioner exclusive." First Am. Compl., ¶¶ 66–70.

Alleging a breach of either express or implied warranty requires a plaintiff to show "not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained." D.C. Code § 28:2-314 cmt. 13; see also id., § 28:2-313. Defendant notes that the D.C. Uniform Commercial Code does not provide a definition of "warranty," MTD at 13, but both parties are in agreement that the definition offered by Plaintiff in its Complaint is widely accepted: "a statement or representation, made by a seller of goods as a part of a contract of sale, concerning the character, quality, or title of goods." Id. (quoting First Am. Compl., ¶ 65) (emphasis added).

TIMM alleges that the "practitioner exclusive" label was a warranty, and that this was breached when Metagenics began selling its products on Amazon. The Court cannot agree because the manner of the sale of a product does not go to its "character, quality, or title."

9

Defendant lists a congeries of cases in its Motion that are illustrative of situations where warranties appropriately apply, see MTD at 13, and it correctly notes that warranties do not go to the manner of sale of a product, but rather to the "quality, quantity, capacity, condition (or) fitness of property for the purposes for which it is sold." Enterprise-Laredo Assocs. v. Hachar's, Inc., 839 S.W. 2d 822, 831 (Tex. App. 1992) (internal quotation marks and citation omitted); see also Picker X-Ray Corp. v. General Motors Corp., 185 A.2d 919, 921 (D.C. 1962) (explaining that "a warranty is a duty imposed by law for the protection of the buying public" so as to protect "innocent consumers from unexpected injuries or . . . defective products"). None of these attributes — that is, the "character, quality, or title" of the goods — changes when the manner of the sale of the good changes.

Another independent ground requires dismissal. The D.C. Code clearly states that a plaintiff must not only satisfy the elements of a breach-of-warranty claim as discussed above, but that he must also notify the seller "within a reasonable time after he discovers or should have discovered any breach" or "be barred from any remedy." D.C. Code § 28:2-607(3)(a). Plaintiff does not plausibly contend that it notified Metagenics within a reasonable time upon discovery of such a breach and does not contest Defendant's argument that it failed to do so until after Plaintiff's account had been canceled and there was no agreement in effect. See Opp. at 11–12; MTD at 15. As a result, the Court finds that TIMM has not plausibly alleged that it satisfied the D.C. Code's notice requirement. For the aforementioned reasons, the Court grants dismissal of Count VI.

    E.  Count VII: Breach of Fiduciary Duty

The final count challenged here is breach of fiduciary duty. "The mere existence of a contractual relationship is ordinarily insufficient to give rise to a fiduciary duty." Steele v.

10

Isikoff, 130 F. Supp. 2d 23, 36 (D.D.C. 2000) (citing Church of Scientology Int'l v. Eli Lilly & Co., 848 F. Supp. 1018, 1028 (D.D.C. 1994)); see also Paul v. Judicial Watch, Inc., 543 F. Supp. 2d 1, 6 (D.D.C. 2008).  In order to find that a fiduciary relationship has been established, one characteristic that "District of Columbia courts have traditionally looked for is a 'special confidential relationship' that transcends an ordinary business transaction." High v. McLean Fin. Corp., 659 F. Supp. 1561, 1568 (D.D.C. 1987).

      Plaintiff here alleges that the two parties had a relationship that "extended beyond the limit[s] of their contractual relationship to a relationship founded on trust and confidence," and that this was breached when Defendant sold its products on Amazon.  See First Am. Compl., ¶¶ 80, 90.  The Complaint further states that "TIMM trusted Metagenics to deliver quality medical grade products for its customers," that the parties "had a long-standing business relationship," and that Defendant "entitled the relationship 'practitioner partnerships.'" Id., ¶¶ 80, 81, 87.  None of these conclusory allegations suffices to show that the two parties had a relationship that extended beyond what is normal between standard commercial entities.  See Sandza v. Barclays Bank PLC, 151 F. Supp. 3d 94, 107 (D.D.C. 2015) (holding there is no breach of fiduciary duty where plaintiff "does not plead any specific facts that suggest something more than a standard, arms-length debtor-creditor relationship").

      Count VII thus also goes by the board.

## IV. Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order granting Defendant's Motion to Dismiss without prejudice.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: October 18, 2022